UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRINA STEWART,

    Plaintiff,

    v.

ST. ELIZABETH'S HOSPITAL,

    Defendant.

Civil Action No. 04-1444 (CKK)
**REDACTED VERSION**

**MEMORANDUM OPINION**
(August 2, 2007)

Currently pending before the Court is Defendant's Motion for Summary Judgment.

Plaintiff, Trina Stewart, brings a claim pursuant to Section 504 of the Rehabilitation Act of 1973,

29 U.S.C. § 794, alleging that her former employer, Defendant St. Elizabeth's Hospital,

discriminated against her on the basis of her disability by failing to accede to her requests for a

reasonable accommodation for her mental disability.  Plaintiff initially brought additional claims

pursuant to Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111

*et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 1-2501 *et*

*seq.*, as well as a claim for Intentional Infliction of Emotional Distress.  However, Plaintiff

dismissed her claims under the DCHRA and for Intentional Infliction of Emotional Distress and,

in its March 12, 2006 Memorandum Opinion, the Court granted Defendant's Motion to Dismiss

with respect to Plaintiff's ADA claim.  Thus, Plaintiff's only remaining claim is that Defendant

violated the Rehabilitation Act by failing to reasonably accommodate Plaintiff's allegedly well-

known mental disability.

Upon a searching consideration of the filings currently before the Court, the attached

exhibits, the relevant case law, and the entire record herein, the Court concludes that genuine

questions of material fact exist which preclude summary judgment with respect to Plaintiff's

alleged request for an accommodation in the fall of 2002. However, Plaintiff cannot establish a

prima facie case of failure to accommodate with respect to her earlier alleged requests. The

Court shall therefore grant-in-part and deny-in-part Defendant's Motion for Summary Judgment,

and shall limit Plaintiff's triable claim to her alleged request for an accommodation in the fall of

2002.[1]

## I. BACKGROUND

### A.    *Plaintiff's Employment History Prior to 2002*

Plaintiff Trina Stewart was employed as a housekeeping aide at St. Elizabeth's Hospital

from 1984 until October 2002. Def.'s Stmt. of Mat'l Facts Not in Dispute (hereinafter "Def.'s

Stmt.") ¶ 2; Pl.'s Stmt. of Mat'l Facts in Dispute (hereinafter "Pl.'s Stmt.") ¶ 2.[2]   St. Elizabeth's

---

[1] At the outset, the Court notes that certain exhibits attached to Defendant's Motion for Summary Judgment as well as Plaintiff's Opposition to Defendant's Motion (specifically Defendant's Exhibits C, G, H, I, and P and Plaintiff's Exhibits 11-16) contain Plaintiff's medical records and were filed under seal pursuant to the protective order in place in this case. However, Defendant's Motion for Summary Judgment and Plaintiff's Opposition are filed on the public docket, along with each party's supporting Statement of Material Facts. Each of these filings contains significant quotations from and information derived from Plaintiff's medical records, which serve to place on the public record some of the contents of the sealed Exhibits. Therefore, in addressing Defendant's Motion for Summary Judgment, the Court shall discuss such information as has been publicly revealed by the parties themselves in their filings in connection with Defendant's Motion. To the extent that the Court considers information not revealed in the public record by the parties themselves to be relevant in resolving the instant motion, the Court shall file a redacted version of this Memorandum Opinion on the publicly available docket and shall file an unredacted version, containing any pertinent non-public information, under seal with the Clerk of the Court for the United States District Court for the District of Columbia.

[2] The Court begins its discussion of the facts by noting that this Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7(h) (formerly Rule 7.1(h)). The local rules for summary judgment "assist[] the district court to maintain docket control and to

Hospital offers inpatient and outpatient treatment to persons afflicted with mental diseases.

Def.'s Stmt. ¶ 3; Pl.'s Stmt. ¶ 3. A housekeeping aide at St. Elizabeth's performs cleaning tasks

as assigned in work areas, including psychiatric wards, clinical areas, and patient and non-patient

areas. *Id.*; Def.'s Ex. B (Housekeeping Aide Pos. Descr.). Housekeeping aides work around and

with psychiatric patients, and patients are often present when cleaning occurs. *Id.*

Plaintiff asserts that she "had a record of mental disability and impairment since

attempting suicide as a teenager." Pl.'s Stmt. ¶ 24. The record demonstrates that Plaintiff was

treated at St. Elizabeth's for a week in 1977 or 1978, when she was 16 years old, following her

attempted suicide after seeing her mother shot and killed. Def.'s Stmt. ¶ 4; Pl.'s Stmt. ¶ 4; Pl.'s

Opp'n at 1; Def.'s Ex. C (5/6/03 Psych. Eval.) at 1. In addition, the record suggests that Plaintiff

may have been diagnosed with Schizoaffective disorder in November of 2002, *see* Pl.'s Opp'n at

5 (citing Pl.'s Ex. 11 (11/21/02 Letter from R. Maman)); Pl.'s Ex. 15 (1/5/04 Letter from S.

Stoops), and it is clear that Plaintiff was diagnosed with Schizophrenia, paranoid type, on April

7, 2003, *see* Def.'s Stmt. ¶ 18; Pl.'s Stmt. ¶¶ 18, 39; Pl.'s Opp'n at 5 (citing Pl.'s Ex. 13 (4/7/03

---

decide motions for summary judgment efficiently and effectively." *Jackson v. Finnegan, Henderson, Farabow, Garret & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996). "Requiring strict compliance with the local rule is justified both by the nature of summary judgment and by the rule's purposes. . . . The procedure contemplated by the rule thus isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record." *Id.* (quoting *Gardels v. CIA*, 637 F.2d 770, 773 (D.C. Cir. 1980). "[A] district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material fact." *Id.* (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988)). As such, in resolving the present summary judgment motion, this Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1; 7(h). The Court also cites directly to the record, where appropriate, to provide additional information not covered in either of the parties' statements.

Stewart Diagnosis)). However, the record contains no evidence that Plaintiff was diagnosed with a mental disability prior to the fall of 2002, or that she suffered from a mental impairment prior to January 2002.[3]

Plaintiff asserts, and Defendant denies, that she was hired by St. Elizabeth's as a housekeeping aide under a program known as the "Patient Act." *See* Pl.'s Stmt. ¶ 25; Def.'s Resp. to Pl.'s Stmt. ¶ 25. Plaintiff supports her claim with her own deposition testimony, *see* Pl.'s Ex. 1 (10/30/06 Stewart Dep. Tr.) at 7:12-9:4; 12:9-22, as well as an August 16, 1983 Instruction from the St. Elizabeth's Policy and Procedures Manual entitled "Employing Present and Discharged Patients of SEH," which establishes a policy and prescribes guidelines for hiring patients and former patients of St. Elizabeth's in order to provide "patients an opportunity to demonstrate job readiness, to update their skills and to establish a successful performance record to counteract prejudice on the part of employers." *See* Pl.'s Ex. 4 (8/16/83 Policy and Procedures Manual Instruction). This evidence establishes that, at least as of 1983, St. Elizabeth's had a policy of employing former patients such as Plaintiff; however, Plaintiff does not proffer evidence to corroborate her assertion that she was hired under that policy.

Plaintiff claims that she was hired by St. Elizabeth's on a temporary basis in 1979, and on

---

[3] In the Disability Intake Questionnaire that Plaintiff completed after filing her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Plaintiff stated that she was first diagnosed with paranoid schizophrenia in 1984. *See* Pl.'s Ex. 10 at 1 (Disability Intake Questionnaire). The Court notes that Plaintiff does not cite this Questionnaire in support of her assertion that she had a record of mental disability, and that the record contains no other evidence that Plaintiff was so diagnosed in 1984. To the contrary, the record indicates that Plaintiff was diagnosed with Schizophrenia, Paranoid Type on April 7, 2003. Pl.'s Opp'n at 5 (citing Pl.'s Ex. 13 (4/7/03 Stewart Diagnosis); *see also* Def.'s Ex. C (5/6/03 Psych. Eval.) at 1. Plaintiff's Opposition also states that Plaintiff had "been previously diagnosed with schizophrenia following her suicide [sic] as a teenager," Pl.'s Opp'n at 10; however, the Court cannot credit this bare assertion, for which Plaintiff offers no factual support.

a permanent basis in 1984. *See* Pl.'s Stmt. ¶ 25; Pl.'s Ex. 1 (10/30/06 Stewart Dep. Tr.) at 7:12-

9:4; 12:9-22.[4] In her job as a housekeeping aide between 1984 and 2002, Plaintiff was assigned

to various work sites within St. Elizabeth's Hospital, including the Eunice Smith Center, the

Acute Care Center ("RMB"), and the John Howard Pavilion ("JHP"). Def.'s Stmt. ¶ 4; Pl.'s

Stmt. ¶ 4. Plaintiff was reassigned from the Smith Center to RMB effective June 5, 2000. Def.'s

Stmt. ¶ 5; Pl.'s Stmt. ¶ 5; Def.'s Ex. Q (5/16/00 Mem. from D. Lucas-Wren to T. Stewart).

Plaintiff had a "dispute" with this assignment because she believed that RMB was understaffed

on weekends, and she went to the Personnel Department and the EEO office to discuss her

"dispute." Def.'s Stmt. ¶ 6; Pl.'s Stmt. ¶ 6. At the EEO office, Plaintiff discussed her "dispute"

with David Z. Prince, EEO Specialist for the District of Columbia Department of Mental Health.

*Id.* At that time, Plaintiff did not inform Mr. Prince that she was experiencing any physical or

mental problems that affected her ability to work. Def.'s Stmt. ¶ 7; Pl.'s Stmt. ¶ 7. While

working at RMB, Plaintiff was supervised by Wiley Trimmier, a Housekeeping Supervisor for

whom Plaintiff had worked for approximately ten years. Def.'s Stmt. ¶ 5; Pl.'s Stmt. ¶ 5. On

July 13, 2000, Mr. Trimmier disciplined Plaintiff for failure to accept weekend assignments,

*see* Def.'s Stmt. ¶ 7; Pl.'s Stmt. ¶ 7; Def.'s Ex. R (7/13/00 Mem. from W. Trimmier to T.

Stewart); however, Plaintiff had no complaints about Mr. Trimmier's supervision, Def.'s Stmt. ¶

7; Pl.'s Stmt. ¶ 7.

---

[4]At the time of Plaintiff's permanent hiring by St. Elizabeth's, the Hospital was under
Federal control. *See* DC Department of Mental Health Home Page, http:////dmh.dc.gov/dmh/
cwp/view,a,3,q,516064.asp. Subsequently, on October 1, 1987, St. Elizabeth's was transferred
from Federal control to the Government of the District of Columbia. *Id.*; Def.'s Reply at 2 n.2.
Accordingly, on August 21, 1987, Plaintiff accepted a position as a Housekeeping Aide with the
District of Columbia, to become effective on October 1, 1987. *See* Def.'s Ex. T (8/21/87 Letter
from F. Smith to T. Stewart).

*B.      Plaintiff's Reassignment to the John Howard Pavilion*

Plaintiff worked as a Housekeeping Aide without incident from 1984 until January 2002.

Pl.'s Ex. 2 (8/22/03 Stewart EEOC Aff.). In January 2002, Plaintiff was reassigned from RMB

to the John Howard Pavilion, a maximum security facility that houses forensic patients, including

pre-trial defendants sent to JHP by the District of Columbia courts for psychiatric screening to

determine if they are competent to stand trial, convicted prisoners who become mentally ill while

incarcerated, and persons found not guilty by reason of insanity who are court-committed until

they regain their sanity. Pl.'s Stmt. ¶ 26; Def.'s Resp. to Pl.'s Stmt. ¶ 26. At JHP, Plaintiff's

housekeeping duties were the same although the environment was different. Def.'s Stmt. ¶ 8a;

Pl.'s Stmt. ¶ 8a[5]; Pl.'s Ex. 1 (10/30/06 Stewart Dep. Tr.) at 43:19-44:10. Plaintiff's transfer to

JHP was effected by Deborah Wren-Lucas, Assistant Chief of Housekeeping, Def.'s Stmt. ¶ 9a;

Pl.'s Stmt. ¶ 28,[6] and once Plaintiff began working at JHP she was supervised by Paula Prioleau,

---

[5] Defendant's Statement of Material Facts erroneously includes two paragraphs numbered 8 and two paragraphs numbered 9. For the sake of clarity, the Court refers to the first paragraph 8 as paragraph "8a," the second paragraph 8 as paragraph "8b," the first paragraph 9 as paragraph "9a," and the second paragraph 9 as paragraph "9b." The Court uses the same reference system with respect to those paragraphs of Plaintiff's Statement of Material Facts that respond to the misnumbered paragraphs of Defendant's Statement.

[6] Defendant asserts that Ms. Wren-Lucas transferred Plaintiff to JHP because Plaintiff was releasing keys to patients and JHP was considered a more appropriate assignment because housekeeping staff are assigned numbered keys that much be returned upon departing the building. Def.'s Stmt. ¶ 9. This assertion is based on the December 15, 2006 Declaration of David Z. Prince, EEO Manager for the District of Columbia Department of Mental Health, in which he avers that in investigating Plaintiff's June 2003 charge of discrimination, he learned that Plaintiff was reassigned to JHP "after the supervisor received complaints that the Plaintiff was releasing hospital keys to patients on the wards of the then Civil side of the Hospital." *See* Def.'s Ex. D (12/15/06 Prince Decl.) ¶ 3. As Plaintiff points out in her Opposition, *see* Pl.'s Opp'n at 3 n.2, Mr. Prince's assertion is inadmissible hearsay because Mr. Prince does not report having been personally involved in the decision to transfer Plaintiff to JHP. *See* Pl.'s Opp'n at 3 n.2. In addition, during her October 26, 2006 deposition in this matter, Ms. Wren-Lucas (who

6

Def.'s Stmt. ¶ 8a; Pl.'s Stmt. ¶ 8a.

The parties agree that upon learning of her reassignment to JHP, Plaintiff protested the transfer to Ms. Wren-Lucas; however, the record is unclear as to the contents of that conversation or conversations. Def.'s ¶ 8b; Pl.'s Stmt. ¶ 28. During her deposition, Plaintiff testified that she asked Ms. Wren-Lucas not to transfer her to JHP, that she believed the transfer was unfair, and that she specifically told Ms. Wren-Lucas, "You know . . . I don't want to work over in John Howard, you know that I am not supposed to be in John Howard." *See* Pl.'s Ex. 1 (10/30/06 Stewart Dep. Tr.) at 60:15:62:17, 70:6-71:5. In her Statement of Material Facts, Plaintiff also asserts that she told Ms. Wren Lucas that she "could not make it in that environment." Pl.'s Stmt. ¶ 28. This assertion, however, is not supported by Plaintiff's own testimony, but rather by notes apparently taken by an EEOC investigator of a conversation with Mr. Trimmier following Plaintiff's June 2003 EEOC complaint, in which Mr. Trimmier purportedly said that Plaintiff asked him to talk to Ms. Wren-Lucas on Plaintiff's behalf because Plaintiff "felt she couldn't make it in that environment." Pl.'s Ex. 6 (5/5/04 FER Notes re: Tele/Conv. with W. Trimmier). For her part, during her deposition in this matter, Ms. Wren-Lucas did not recall whether Plaintiff made any protest about her transfer to JHP, and did not recall speaking to Mr. Trimmier about

---

was involved in the decision to transfer Plaintiff to JHP) did not initially recall the circumstances surrounding Plaintiff's transfer. Pl.'s Ex. 3 (10/26/06 Wren-Lucas Dep. Tr.) at 25:1-31:9. Even after being shown Defendant's responses to Plaintiff's interrogatories in an attempt to refresh her recollection, Ms. Wren-Lucas stated only that her recollection was refreshed "[a] little. And the only thing I can speak on that I remember vaguely is speaking to [Plaintiff] about her keys. . . I think it was laying her keys on her cart. . . . I remember vaguely speaking to her about keys being around and she could not leave her keys on the cart because of her chemicals and stuff. And a patient wasn't supposed to have access to her keys. . . ." *Id.* The competence of this evidence is irrelevant, however, because the reason for Plaintiff's transfer to JHP is of no consequence in resolving the instant Motion for Summary Judgment.

Plaintiff's transfer to JHP. Pl.'s Ex. 3 (10/26/06 Wren-Lucas Dep. Tr.) at 31:21-32:8.

In any event, Plaintiff does not claim that she told Ms. Wren-Lucas that she believed she should not be transferred to JHP due to a mental disability on her part, and there is no evidence in the record to that effect. During her deposition, Plaintiff was specifically asked whether she was sick when she asked Ms. Wren-Lucas not to be transferred to JHP. Pl.'s Ex. 1 (10/30/06 Stewart Dep. Tr.) at 61:7-20. In response, Plaintiff stated "No. I was fine." *Id.* When asked whether she told Ms. Wren-Lucas that she was sick, Plaintiff responded, "I was fine . . . Wasn't no problems. Everything was good for me." *Id.* It is therefore not surprising that Ms. Wren-Lucas did not ask Plaintiff for any medical documentation in connection with Plaintiff's request not to be transferred to JHP. Pl.'s Stmt. ¶ 29; Def.'s Resp. to Pl.'s Stmt. ¶ 29. Plaintiff asserts that Ms. Wren-Lucas refused Plaintiff's request not to be transferred to JHP and told Plaintiff that she would be fired if she did not take the assignment. Pl.'s Stmt. ¶ 30; Def.'s Resp. to Pl.'s Stmt. ¶ 30; Def.'s Stmt. ¶ 9b.

Plaintiff's deposition testimony that she told Ms. Wren-Lucas "you know that I am not supposed to be in John Howard," Pl.'s Ex. 1 (10/30/06 Stewart Dep. Tr.) at 70:15-22, appears to be related to her claim that "[u]nder the Patient Act, patient hires were not assigned to the JHP," Pl.'s Stmt. ¶ 27. During her deposition, Ms. Wren-Lucas testified that she was aware that Plaintiff was a patient hire and that she believed patient hires "stayed at the hospital before they became a regular employee," perhaps in connection with a substance-abuse program. Pl.'s Ex. 3 (10/26/06 Wren-Lucas Dep. Tr.) at 13:5-14:16. However, Plaintiff does not provide Ms. Wren-Lucas' response to the question of whether patient hires were to be treated any differently than other employees. *Id.* at 14:17-19. In support of her claim that patient hires were not assigned to

8

JHP, Plaintiff cites to her own testimony and declaration to that effect, *see* Pl.'s Ex. 1 (10/30/06 Stewart Dep. Tr.) at 70:15-22; Pl.'s Ex. 2 (8/22/03 Stewart EEOC Aff.), as well as to Mr. Trimmier's apparent statement to the EEOC investigator that "[i]nitially when [St. Elizabeth's] started patient hires, they had a practice of not placing them at John Howard," Pl.'s Ex. 6 (5/5/04 FER Notes re: Tele/Conv. with W. Trimmier).

Plaintiff does not proffer any formal policy indicating that, as of 2002, patient hires were not to be placed at JHP. Moreover, neither the 1983 St. Elizabeth's Instruction on Employing Present and Discharged Patients of SEH or the official description of the housekeeping aide position includes such a limitation. *See* Pl.'s Ex. 4 (8/16/83 Policy and Procedures Manual Instruction); Def.'s Ex. B (Housekeeping Aide Pos. Descr.). Instead, the housekeeping aide position description specifically states that housekeeping aides "[m]ay be assigned to other units in Housekeeping as required." Def.'s Ex. B (Housekeeping Aide Pos. Descr.). The record therefore does not support Plaintiff's assertion that in 2002 patient hires could not be assigned to JHP. Moreover, even if patient hires were not assigned to JHP in 2002, when Plaintiff was transferred to JHP she had been a permanent employee of St. Elizabeth's Hospital for more than 16 years, and therefore was no longer a patient hire.

In addition to complaining to Ms. Wren-Lucas about her transfer to JHP, Plaintiff asserts that she complained to Mr. Trimmier about the transfer. Pl.'s Stmt. ¶ 31. This assertion is supported by the EEOC investigator's notes of his conversation with Mr. Trimmier, which indicate that Plaintiff told Mr. Trimmier that she didn't feel that she could make it in the environment of JHP, and asked him to speak to Ms. Wren-Lucas on her behalf. *Id.*; Pl.'s Ex. 6 (5/5/04 FER Notes re: Tele/Conv. with W. Trimmier). However, the EEOC investigator's notes

9

also indicate that Mr. Trimmier had no idea what Plaintiff was referring to when she said she

could not make it in the environment at JHP. *Id.* Mr. Trimmier also appears to have told the

EEOC investigator that he was aware that Plaintiff was a patient hire but that he did not "know

what her problem had been" and that she "never mentioned anything more about the details."

*Id.*[7] Furthermore, Mr. Trimmier apparently reported that Plaintiff "had been very functionable

and a good employee when she worked under him" and that he did not think Plaintiff was

disabled. *Id.*

Plaintiff also asserts that she complained to her supervisor, Ms. Prioleau, about her

assignment to JHP, Pl.'s Stmt. ¶ 33; however, the record evidence to which Plaintiff cites in

support of this assertion does not indicate that Plaintiff complained to Ms. Prioleau, *see* Pl.'s Ex.

2 (8/22/03 Stewart EEOC Aff.). Specifically, Plaintiff testified at her deposition that she did not

complain to Ms. Prioleau because there was no need to do so as Ms. Prioleau knew that Plaintiff

did not want to be transferred to JHP. Pl.'s Ex. 1 (10/30/06 Stewart Dep. Tr.) at 66:2-7.

Moreover, none of the record evidence of Plaintiff's conversations with Mr. Trimmier and Ms.

Prioleau suggests that Plaintiff specifically told either of them that she did not believe she should

be transferred to JHP due to a mental disability on her part. Accordingly, neither Mr. Trimmier

nor Ms. Prioleau asked Plaintiff to provide any medical documentation. Pl.'s Stmt. ¶ 33; Def.'s

Resp. to Pl.'s Stmt. ¶ 33.

Finally, Plaintiff asserts that she complained about her transfer to Facility Administrator

---

[7] The EEOC investigator appears to have asked Mr. Trimmier if Plaintiff mentioned to
him "that her care givers did not want her working in that type of environment," to which Mr.
Trimmier said no. Pl.'s Ex. 6 (5/5/04 FER Notes re: Tele/Conv. with W. Trimmier). This
reference to "care givers" appears to have been made by the EEOC investigator following
Plaintiff's June 2003 EEOC complaint, rather than a term used by Mr. Trimmier himself.

Jasper Burnett early in 2002. Pl.'s Stmt. ¶ 33. Plaintiff does not specify when this conversation

allegedly occurred, although her Statement of Material Facts appears to follow a chronological

format and discusses this conversation prior to an incident that occurred in April 2002 *Id.* ¶ 34.

Regardless of when Plaintiff spoke to Mr. Burnett in early 2002, however, she does not claim

that she told Mr. Burnett at that point that she believed she should not be transferred due to a

physical or mental disability and the record contains no evidence to that effect. Instead,

Plaintiff's deposition testimony regarding her conversation with Mr. Burnett in early 2002

suggests that Plaintiff complained about employees spreading rumors about her, but not about

anything related to a physical or mental illness. *See* Pl.'s Ex. 1 (10/30/06 Stewart Dep. Tr.) at

71:6-22 ("he said that I know how my supervisor or foreman . . . know how to talk, and he was

going to get them together and stop spreading rumors about when an employee talked to them

and it's confidential. . ."). For its part, Defendant admits that Plaintiff spoke with Ms. Prioleau

and Mr. Burnett about her transfer, but asserts that "[a]t no time . . . did plaintiff complain that

she was suffering from a mental or physical [sic] that substantially limited her ability to work

John Howard Pavilion." Def.'s Resp. to Pl.'s Stmt. ¶ 33.

      C.     *Events Occurring While Plaintiff Worked at the John Howard Pavilion*

      On March 26, 2002, Plaintiff filed a request through her union representative to "be

removed from her present work site, because of the cleaning chemical she was working with or

improve the ventilation." Def.'s Stmt. ¶ 10 (citing Def.'s Ex. E (3/26/02 Union Grievance));

Pl.'s Stmt. ¶ 10. Plaintiff's grievance was supported by a certification from Dr. Letitia Carlson,

stating that Plaintiff had "symptoms associated with the current cleaning products she is using,"

such that Plaintiff's work location should be changed, the ventilation improved, or the cleaning

products Plaintiff used should be changed. *Id.* The situation appears to have been resolved by Ms. Prioleau, who told Plaintiff that she would be exposed to the same chemicals in any work area and agreed that Plaintiff would not use any chemical that would be harmful to her health. Pl.'s Ex. 7 (9/15/03 Prioleau Mem.). The grievance, the accompanying doctor's certification, and Ms. Prioleau's description of the grievance do not suggest that Plaintiff indicated any physical or mental limitation in her performance as a housekeeping aide. *Id.*; Def.'s Stmt. ¶ 11; Pl.'s Stmt. ¶ 11.

During the period that Plaintiff worked at JHP – between January and October 2002 – Plaintiff requested and was granted annual leave on fifteen separate occasions, for a variety of reasons including car trouble, babysitting difficulties, deaths in her family, her children's illnesses, and her own illnesses (sore throat and a rash). Def.'s Stmt. ¶ 12; Pl.'s Stmt. ¶ 12; Def.'s Exs. F(1)-F(16) (Employee Absence Reports dated 1/30/02-9/16/02). On September 16, 2002, Plaintiff requested and was granted 56 hours of annual leave following the death of her sister. *Id.*; Def.'s Stmt. ¶ 13; Pl.'s Stmt. ¶ 13; Def.'s Ex. F(15) (9/16/02 Employee Absence Report). Plaintiff admits that her "leave record appears to contradict her assertion that she was experiencing mental problems that affected her ability to work and that she was substantially impaired in the performance of her duties because of her assignment to John Howard." Def.'s Stmt. ¶ 13; Pl.'s Stmt. ¶ 13.

On or about April 19, 2002, Plaintiff reported that a JHP inmate exposed himself to Plaintiff while she was cleaning. Pl.'s Stmt. ¶ 34; Def.'s Resp. to Pl.'s Stmt. ¶ 34; Pl.'s Ex. 8 (4/19/02 Unusual Incident Report). In the report she filed about the incident, Plaintiff stated that she ran to tell a supervisor and then removed her cleaning materials and left the ward. Pl.'s Ex. 8

12

(4/19/02 Unusual Incident Report).  According to Plaintiff, she "thereafter became increasingly fearful and panicky while working at JHP and had to be escorted by other staff members" on the wards.  Pl's Stmt. ¶ 34; Pl.'s Ex. 2 (8/22/03 Stewart EEOC Aff.) ("I began to feel like I was losing control of myself and the panic attacks took over. . . . I often thought the staff talked about me and I often had to work alone."); Pl.'s Ex. 9 (6/12/03 EEOC Charge Questionnaire) ("I became fearful and panicy [sic] my heart would race each day working in that very restrictive place with all those dangerous criminals.  I even had to be escorted by other staff members on different wards as protection from the patients in order to do my job.").

Plaintiff asserts that her mental health gradually declined between January and October 2002 and that she "was experiencing unexplained paranoid and delusional behavior which was observed by several of defendant's employees."  Pl.'s Stmt. ¶ 35.  As support for this assertion, Plaintiff relies on a statement written by Ms. Prioleau in September 2003 (perhaps in connection with Plaintiff's June 2003 EEOC charge), in which Ms. Prioleau reports that she was called to the housekeeping office one evening by Mr. William Harling, an Assistant Housekeeping Supervisor, who had found Plaintiff crying, shaking, and talking to herself.  *See* Pl.'s Ex. 7 (9/15/03 Prioleau Mem.).  When Ms. Prioleau arrived at the office, Plaintiff was "talking about going over to RMB Building and busting Mr. Wiley Trimmier and Ms. Gwendolyn Jones Housekeeping Aid [sic] in the head with a mop wringer."  *Id.* at 1.  Ms. Prioleau recounts that she and Mr. Harling tried to calm Plaintiff down and that Plaintiff "kept on crying stating that employees keep asking her questions about her and Mr. Trimmier and did she have aids."  *Id.* Ms. Prioleau further states that she called Mr. Trimmier into the housekeeping office to discuss the situation and Mr. Trimmier suggested that Plaintiff was "stress[ed] out behind her family

13

worrying her and behind losing her sister and her uncle." *Id.* at 2.  Ms. Prioleau reports that she

told Mr. Trimmier that Plaintiff "was getting sick way before her sister's or uncle's death" *Id.*  In

addition, Ms. Prioleau states that Plaintiff spoke with Ms. Wren-Lucas regarding being

transferred off of the St. Elizabeth's grounds to another site "because she didn't want to be

around certain employees," but Ms. Wren-Lucas refused the transfer. *Id.*

  Although Plaintiff places great emphasis on Ms. Prioleau's statement, Ms. Prioleau's

description of the incident where Plaintiff was found "crying, shaking, talking to herself"

indicates that Plaintiff was upset about rumors being spread about her by other employees.  In

addition, Ms. Prioleau's statement that Plaintiff had been "getting sick way before her sister's or

uncle's death," *see* Pl.'s Stmt. ¶ 35, offers no indication of whether Plaintiff's observed

"sickness" was mental or physical, Pl.'s Ex. 7 (9/15/03 Prioleau Mem.)  As noted above, Plaintiff

requested and was granted annual leave time due to physical illnesses on at least three occasions

between March and July 2002. *See* Def.'s Exs. F(6); F(9); and F(14) (Employee Absence

Reports dated 3/18/02, 4/8/02, and 7/18/02).  Thus, although Plaintiff asserts that during the fall

of 2002 she experienced "unexplained paranoid and delusional behavior," Pl.'s Stmt. ¶ 35, the

record contains no basis for concluding that Plaintiff's co-workers or supervisors viewed it as

such.

  Moreover, when asked at her deposition whether she spoke with anyone at work about the

difficulties she was allegedly having in the fall of 2002, Plaintiff responded, "No. They talk. I

couldn't tell people my problems.  They go on back and tell.  They already made a bunch of

rumors about me.  So I wasn't going to let them know anything."  Def.'s Ex. S (10/30/06 Stewart

Dep. Tr.) at 50:13-20.  Finally, David Z. Prince, the DC Department of Mental Health EEOC

Specialist who was on-site at St. Elizabeth's during the relevant time period, avers "at no time did [Plaintiff] complain to me that she was experiencing mental or physical problems that affected her ability to work. In addition, at no time did [Plaintiff] submit a medical diagnosis demonstrating that she was substantially impaired in the performance of her duties." Def.'s Ex. D (12/15/06 Prince Decl.) ¶ 4. Plaintiff has thus failed to proffer evidence that she specifically discussed any mental disability with her co-workers or supervisors prior to September 2002, or that her co-workers or supervisors regarded her as having a mental disability prior to September 2002.

In her Statement of Material Facts, Plaintiff asserts that on September 9, 2002 she advised Facility Administrator Jasper Burnett that she needed a transfer. Pl.'s Stmt. ¶ 36. In support of this assertion, Plaintiff cites to her June 22, 2003 EEOC Disability Intake Questionnaire, in which she states only that Mr. Burnett became aware of Plaintiff's disability on September 9, 2002, but does not provide any additional details. Pl.'s Ex. 10 (6/22/03 Disability Intake Questionnaire at 2). In addition, however, Plaintiff's August 22, 2003 EEOC Affidavit avers that shortly before she went on medical leave in October 2002, Plaintiff "had a meeting with Jasper Bernnett [sic], Administrator, about my request to be removed from the Ward because of my disability. Mr. Bernnett [sic] told me to talk to CEO, Joy Harlin. Mr. Bernnett [sic] was supposed to get back to me within ten (10) days; however, he never responded to my request." Pl.'s Ex. 2 (8/22/03 Stewart EEOC Aff.). Defendant denies that Plaintiff spoke with Mr. Burnett on September 9, 2002, Def.'s Resp. to Pl.'s Stmt. ¶ 36; however, a factual issue exists as to whether Plaintiff spoke to Mr. Burnett in the fall of 2002, and if so, whether she advised him that

she believed she should be reassigned out of JHP due to a mental disability.[8]

Plaintiff also asserts that on September 10, 2002, Plaintiff's "deteriorating mental state was discussed" "at a supervisors meeting which included her then supervisor Prioleau." Pl.'s Stmt. ¶ 36. Plaintiff supports this assertion with her June 22, 2003 Disability Intake Questionnaire, in which she states that Mr. Holland, an assistant "to the supervisor Paula," "told Paula, Ms. Johnson, Dona McRan & Mr. Banks that girl is sick, she needs help etc. at a supervisor meeting" on approximately September 10, 2002. Pl.'s Ex. 10 (6/22/03 Disability Intake Questionnaire) at 3. Plaintiff further states that this comment was witnessed by "Angie Johnson and most of my other co-workers." *Id.* Plaintiff provides no indication as to how she learned of Mr. Holland's alleged comment, and thus does not claim to have been at the supervisors' meeting in question and to have heard Mr. Holland's alleged comment herself. Accordingly, Mr. Holland's alleged comment appears to be inadmissible hearsay because, at best, Plaintiff was informed of his comment by someone in attendance at the meeting. The Court therefore cannot consider as competent evidence Plaintiff's assertion that her "deteriorating mental state was discussed" "at a supervisors meeting" on September 10, 2002. Pl.'s Stmt. ¶ 36.

D.      *Plaintiff's Suicide Attempt and Departure from St. Elizabeth's Hospital*

During her deposition, Plaintiff testified that in October of 2002, she became sick and could not eat, sleep or function, and was "hearing people". Def.'s Ex. S (10/30/06 Stewart Dep. Tr.) at 16:20-17:5. At first Plaintiff did not "know what was wrong" and went to see her medical

---

[8] Although Plaintiff's Amended Complaint alleges that she requested reassignment away from JHP from Mr. Burnett in early October 2002, *see* Am. Compl. ¶ 9, Plaintiff now asserts that she made this request in September 2002, Pl.'s Stmt. ¶ 21 (citing Pl.'s Ex. 10 (6/22/03 Disability Intake Questionnaire) at 2). The Court shall therefore refer to Plaintiff's alleged conversation with Mr. Burnett as occurring in the fall of 2002.

doctor, who referred Plaintiff to a psychiatrist. *Id.* at 15:1-16-12. On October 15, 2002, Plaintiff

attempted suicide for the second time. Pl.'s Stmt. ¶ 37; Def.'s Resp. to Pl.'s Stmt. ¶ 37. On

November 3, 2003, Plaintiff received a Psychiatric Assessment at George Washington Hospital,

the record of which indicates that Plaintiff "suffered from clinical depression to include sad

mood(s), loss of appetite and sleep, crying and feelings of isolation." Def.'s Stmt. ¶ 16; Pl.'s

Stmt. ¶ 16; Def.'s Ex. G (11/3/02 Psych. Assm't). The record of Plaintiff's November 3, 2003

Assessment further indicate that Plaintiff could not "*identify any recent stressor . . . She says*

*work is stressful but nothing out of ordinary*." *Id.* (emphasis added). It therefore appears that

Plaintiff's mental difficulties in the fall of 2002 were not contemporaneously attributed to her

assignment to JHP.

Following Plaintiff's suicide attempt, she was treated at the Trico Corporation by Dr.

Robert Maman. Def.'s Exs. H & I (11/15/02 and 11/21/02 Letters from Dr. R. Maman); Def.'s

Ex. C (5/6/03 Letter from Stoops and Baden). In a certification dated November 21, 2002, Dr.

Maman stated that Plaintiff "has been attending individual therapy and receives Psychiatric

services since November 7, 2002, consistently every week. [Plaintiff] suffers from

Schizoaffective disorder and needs to increase her clinic visits to twice a week. She will be

followed closely and should not return to work for the next four weeks pending further review."

Def.'s Stmt. ¶ 17; Pl.'s Stmt. ¶¶ 17, 38; Def.'s Exs. H & I (11/15/02 and 11/21/02 Letters from

Dr. Maman); Pl.'s Opp'n at 5. **REDACTED**.

On April 7, 2003, Dr. Bozena Baden diagnosed Plaintiff with Schizophrenia, paranoid

type, and Schizoaffective Disorder, depressive type. Pl.'s Stmt. ¶ 39; Def.'s Resp. to Pl.'s Stmt.

¶ 39; Pl.'s Opp'n at 5 (citing Pl.'s Ex. 13 (4/7/03 Stewart Diagnosis)). On May 6, 2003, therapist

Sheryl A. Stoops and psychiatrist Dr. Bozena Baden wrote in a certification to the Civil Services

Retirement System that Plaintiff had been a client at the Charles County Mental Health Center

since March 17, 2003.  Def.'s Stmt. ¶¶ 18-19; Pl.'s Stmt. ¶¶ 18-19; Def.'s Ex. C (5/6/03 Letter

from Stoops and Baden) at 1.  The May 6, 2003 certification reports that Plaintiff "has a history

of trauma which resulted in psychiatric hospitalizations.  **REDACTED**.  The first at age 16 when

she saw her mother being shot and killed, then last year after her sister was killed in a hit and run

accident, and in February 2003 following a severe depressive and psychotic episode." *Id.*  As

with Plaintiff's earlier medical reports, the May 6, 2003 certification does not attribute Plaintiff's

mental difficulties to her transfer to JHP.  **REDACTED**.

Plaintiff never returned to work at St. Elizabeth's following her October 2002 suicide

attempt.  Def.'s Stmt. ¶¶ 15, 20; Pl.'s Stmt. ¶¶ 15, 20.  Plaintiff periodically submitted requests

for leave without pay to Ms. Prioleau, which were routinely approved until Plaintiff's application

for Disability Retirement was approved on January 25, 2005.  Def.'s Stmt. ¶ 20; Pl.'s Stmt. ¶ 20;

Def.'s Exs. J, K, M, N, O (Requests for LWOP dated 11/22/02-10/16/030.  Plaintiff's requests

for leave without pay were accompanied by certifications that Plaintiff was under a doctor's care

and that she was totally disabled from work.  Def.'s Stmt. ¶ 20; Pl.'s Stmt. ¶ 20; Def.'s Exs. H, I,

L (Certifications dated 11/15/02-11/12/03).  Specifically, on November 12, 2003, Plaintiff's

therapist, Ms. Stoops, **REDACTED**.  Pl.'s Stmt. ¶ 40; Def.'s Resp. to Pl.'s Stmt. ¶ 40; Pl.'s

Opp'n at 5-6 (citing Pl.'s Ex. 14 (11/12/03 Letter from S. Stoops)).  Ms. Stoops further stated:

> **REDACTED**.  Hopefully, she will be able to return to work in the very near
> future.  When [Plaintiff] does return to work, she cannot return to the main
> campus of St. Elizabeth's Hospital.  **REDACTED**.

*Id.*

18

Although Ms. Stoops' November 2003 certification suggested that Plaintiff might be fit to return to work shortly, Plaintiff does not proffer evidence that she actually requested to return to work at St. Elizabeth's or with the DC Department of Mental Health after being deemed fit for work by her doctors and therapists. For its part, Defendant asserts that Plaintiff was totally disabled from work as of October 2002, Def.'s Stmt. ¶ 23, and the doctors' certifications described above support the conclusion that Plaintiff was, at least on a temporary basis, disabled from work. Although Plaintiff denies Defendant's assertion that she was disabled from work, Pl.'s Stmt. ¶ 23, her own Statement of Material Facts states that following her October 2002 suicide attempt, Plaintiff "was never fit for work again." Pl.'s Stmt. ¶ 37.

The strongest suggestion that Plaintiff asked to return to work following her October 2002 suicide attempt is found in her August 22, 2003 EEOC Affidavit, in which she states "[s]ince going out on medical leave in October 2002, I have tried several times to be returned to work; however none of my requests have been granted. The Respondent refuse [sic] to place me in a suitable position that would accommodate my disability and work restrictions." Pl.'s Ex. 2 (8/22/03 Stewart EEOC Aff.). However, even assuming that Plaintiff requested to return to work prior to August 2003, the record demonstrates that Plaintiff was not yet fit to do so at that point in time. As discussed above, Ms. Stoops' November 3, 2003 certification indicates that Plaintiff was still not ready to return to work as of the fall of 2003. Pl.'s Ex. 14 (11/12/03 Letter from S. Stoops). Plaintiff therefore has not proffered evidence that she asked to return to work after being deemed fit to do so by her doctors and therapists, but was denied the opportunity to do so.

On December 17, 2003, Plaintiff's case manager, Marcy Kinnaman, wrote a letter stating that Plaintiff:

19

> [N]ever had any problems until last year she was transferred to a new ward of the
> hospital where the criminally ill patients were hospitalized. She protested against
> this because she did not feel comfortable based on her psychiatric history but her
> supervisor would not listen to her argument. [Plaintiff] was told that if she did not
> go to work on the other ward then she would lose her job. Because she was
> scared, [Plaintiff] went to the other ward. While she was there, several things
> occurred that triggered [Plaintiff] to decompensate **REDACTED**.

Pl.'s Opp'n at 6 (citing Pl.'s Ex. 16 (12/17/03 Letter from M. Kinnaman)). Ms. Stoops recounted

a similar history in a letter dated January 5, 2004, and stated that, "[g]iven [Plaintiff's] stable

work history and psychiatric stability for 19 or 20 years until being transferred to the John

Howard Building, in my opinion, it is highly probable that the stress of this job assignment is

what caused her to decompensate." Pl.'s Opp'n at 6 (citing Pl.'s Ex. 15 (1/5/04 Letter from S.

Stoops)).

Although these medical records suggest that Plaintiff's mental difficulties in the fall of

2002 were triggered by her transfer to JHP, the reports proffered by Defendant – which followed

more closely upon Plaintiff's October 2002 suicide attempt – do not link Plaintiff's mental

difficulties to her transfer to JHP. *See* Def.'s Exs. C (5/6/03 Letter from Stoops and Baden); G

(11/3/02 Psych. Assm't); and P (2/13/03 Psych. Discharge Note). A factual question thus clearly

exists as to what role, if any, Plaintiff's transfer to JHP played in triggering her mental

difficulties in the fall of 2002.

### E.  Procedural History

On June 12, 2003 Plaintiff filed a charge with the EEOC alleging that she was "harassed

by a couple of supervisors who continued to move me from on[e] division to the other," and that

she "asked many times to be removed from [the JHP] environment but no one listened to me. I

became very ill. When I was originally hired I was not supposed to be placed in that type of

environment." Pl.'s Ex. 9 (6/12/03 EEOC Charge Questionnaire). The EEOC mailed Plaintiff a

Notice of her Right to Sue on May 24, 2004, Am. Compl. ¶ 13, and Plaintiff filed her initial

Complaint in this action on August 25, 2004. Pursuant to Federal Rule of Civil Procedure 15(a),

Plaintiff requested and was granted to leave to file an Amended Complaint, which was formally

entered on February 8, 2005. Plaintiff's Amended Complaint asserted two claims – Count I

alleged that Defendant violated Title I of the ADA by failing to accommodate Plaintiff's

disability, and Count II alleged that the same conduct violated Section 504 of the Rehabilitation

Act. Am. Compl. ¶¶ 14-22.

     In its March 12, 2006 Memorandum Opinion, the Court granted Defendant's Motion to

Dismiss with respect to Plaintiff's ADA claim, but denied Defendant's Motion to Dismiss with

respect to Plaintiff's Rehabilitation Act claim. *See Stewart v. St. Elizabeth's Hospital*, No. Civ.

A. 04-1444 CKK, 2006 WL 626921, at *1 (D.D.C. Mar. 12, 2006). Following discovery in this

action, Defendant filed its Motion for Summary Judgment on December 22, 2006. *See* Def.'s

Mot. for Summ. J. Plaintiff filed her Opposition to Defendant's Motion for Summary Judgment

on January 31, 2007, *see* Pl.'s Opp'n, and Defendant filed its Rely to Plaintiff's Opposition on

February 20, 2007, *see* Def.'s Reply.

## II. LEGAL STANDARD

     A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994). Under the summary judgment standard, Defendant, as the moving party, "bears

the initial responsibility of informing the district court of the basis for its motion, and identifying

those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed.

2d 265 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and

by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S. Ct.

2548.

Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505,

2510, 91 L. Ed. 2d 202 (1986). To be material, the factual assertion must be capable of affecting

the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient

admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at

251-52, 106 S. Ct. 2505 (the court must determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative,

summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S. Ct. 2505

(internal citations omitted). "Mere allegations or denials of the adverse party's pleading are not

enough to prevent the issuance of summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46,

49 (D.D.C. 1996). The adverse party "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  Instead, while the movant

bears the initial responsibility of identifying those portions of the record that demonstrate the

absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward

with 'specific facts showing that there is a *genuine issue for trial*.'"  *Id.* at 587, 106 S. Ct. 1348

(citing Fed. R. Civ. P. 56(e)) (emphasis in original).

### III. DISCUSSION

Plaintiff's Amended Complaint alleges that Defendant violated Section 504 of the

Rehabilitation Act when it refused to accommodate Plaintiff's mental disabilities by reassigning

her away from JHP.  Defendant moves for summary judgment, arguing that Plaintiff cannot make

out a prima facie case of failure to accommodate because she did not provide Defendant with

notice of her alleged disability, and further arguing that the accommodation that Defendant

provided Plaintiff once it was provided notice of her disability – i.e., leave without pay – was

reasonable under the circumstances.  The Court agrees with Defendant that Plaintiff cannot

establish a prima facie case of failure to accommodate with respect to Plaintiff's January 2002

requests for an alternative assignment, or with respect to any requests for accommodation made

after her October 2002 suicide attempt.  However, the Court concludes that genuine issues of

material fact exist as to whether Plaintiff made, and Defendant denied, a request for a reasonable

accommodation to Facility Administrator Jasper Burnett in the fall of 2002.

*A.*     *Legal Framework*

Pursuant to Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual

with a disability in the United States . . . shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

The Rehabilitation Act further states that "[t]he standards used to determine whether this section

has been violated in a complaint alleging employment discrimination under this section shall be

the standards applied under [certain provisions of] the [ADA]." 29 U.S.C. § 794(d); *see also*

*Breen v. Dep't. of Transp.*, 282 F.3d 839 (D.C. Cir. 2004). To establish a prima facie case of

discrimination under the Rehabilitation Act for failure to accommodate, Plaintiff must show "(1)

that [she] was an individual who had a disability within the meaning of the statute; (2) that the

employer had notice of [her] disability; (3) that with reasonable accommodation [she] could

perform the essential functions of the position; and (4) that the employer refused to make such

accommodations." *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 (D.D.C. 2002) (quoting

*Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)); *see also Lester v. Natsios*, 290 F.

Supp. 2d 11, 23 (D.D.C. 2003) (quoting *Scarborough*, 190 F. Supp. 2d at 19).

Both the ADA and the EEOC's Rehabilitation Act regulations define a disability as "(A)

a physical or mental impairment that substantially limits one or more of the major life activities

of such individual; (B) a record of such an impairment; or (C) being regarded as having such an

impairment." 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g).[9] In turn, the EEOC's regulations

define "Substantially limits" as

> (i) unable to perform a major life activity that the average person in the general
> population can perform or (ii) significantly restricted as to the condition, manner
> or duration under which an individual can perform a major life activity as
> compared to the condition, manner, or duration under which the average person in

---

[9] The Supreme Court has previously assumed that the EEOC's Rehabilitation Act
regulations are valid, without deciding the level of deference, if any, they are due. *See Toyota v.
Williams*, 534 U.S. 184, 194, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002); *Sutton v. United Air
Lines, Ind.*, 527 U.S. 471, 480, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999).

the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). In *Toyota v. Williams*, 534 U.S. 184, 195, 122 S. Ct. 681, 151 L. Ed.

2d 615 (2002), the Supreme Court held that "to be substantially limited . . . an individual must

have an impairment that prevents or severely restricts the individual from doing activities that are

of central importance to most people's daily lives. The impairment's impact must also be

permanent or long term." *Id.* at 198, 122 S. Ct. 681 (citing 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii)

(2001)). Although *Toyota* dealt with the proof necessary under the ADA to establish a

substantial limitation in the major life activity of performing manual tasks, the Court sees no

reason why this analysis would not be equally applicable to claims involving other major life

activities. *See Haynes v. Williams*, 279 F. Supp. 2d 1, 9-10 (D.D.C. 2003), *aff'd*, 392 F.3d 478

(D.C. Cir. 2004).

"It is the plaintiff's burden to prove that [s]he is disabled" within the meaning of the

Rehabilitation Act. *Haynes v. Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004). Significantly,

"merely having an impairment does not make one disabled," *Toyota*, 534 U.S. at 195, 122 S. Ct.

681, and "it is insufficient for individuals attempting to prove disability status to merely submit

evidence of a medical diagnosis of an impairment. Instead the Act requires [such individuals to

offer] evidence that the extent of the limitation [caused by the impairment] in terms of their own

experience is substantial," *id.* at 198, 122 S. Ct. 681. Thus, to succeed on her claim of failure to

accommodate, Plaintiff must prove that she "ha[d] a permanent (or long-term) impairment that

substantially limits a major life activity, but that with a reasonable accommodation she [could]

perform the essential functions of the job." *Lester*, 290 F. Supp. 2d at 24 (citing *Flemmings v.*

*Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999)).[10]

> B.      *Plaintiff Cannot Establish a Prima Facie Case With Respect to Her January 2002 Request for an Alternative Assignment*

Plaintiff's Amended Complaint principally alleges that she requested accommodation, in the form of reassignment from JHP, at *two* separate points in time.  First, Plaintiff alleges that she requested an alternate assignment from Ms. Wren-Lucas when she was first reassigned to JHP in January 2002, but that Ms. Wren-Lucas told Plaintiff that she would be fired if she refused to accept the reassignment.  *See* Am. Compl. ¶ 8.  Second, Plaintiff alleges that she requested a reassignment out of JHP from Mr. Burnett in the fall of 2002, but that Defendant made no effort to transfer Plaintiff out of JHP.  *See id.* ¶ 9.  The Court therefore focuses on these two alleged requests for accommodation.

> 1.      *Plaintiff Cannot Show That She Was Disabled in January 2002*

As noted above, a "disability" for purposes of the Rehabilitation Act includes "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g).  Taking these definitions in reverse order, the Court concludes that Plaintiff cannot meet any of them.  Plaintiff cannot meet

---

[10] The parties' briefs address Defendant's Motion for Summary Judgment pursuant to the ordinary motion for summary judgment standard, and not under the three-part burden-shifting analysis created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Although the case law is somewhat inconsistent, courts in this Circuit generally do not apply the *McDonnell Douglas* framework in evaluating failure to accommodate claims.  *See Flemmings*, 198 F.3d at 860-61; *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993), *cert. denied*, 511 U.S. 1030, 114 S. Ct. 1538, 128 L. Ed. 2d 190 (1994); *Lester*, 290 F. Supp. 2d at 24 n.4; *but see Woodruff v. Peters*, 482 F.3d 521 (D.C. Cir. 2007) (applying *McDonnell Douglas* framework to claims of failure to accommodate and retaliation).  The Court shall therefore consider Defendant's Motion for Summary Judgment pursuant to the standard set forth above.

subsection (C) by showing that she was "regarded as having" a mental impairment prior to

January 2002, because that prong addresses the situation where an employer erroneously believes

that an individual suffers from a disability or erroneously believes that a non-limiting impairment

substantially limits one or more major life activities. *See Sutton*, 527 U.S. at 489, 119 S. Ct.

2139; *see also Haynes*, 279 F. Supp. 2d at 11-12.

　　Nor does Plaintiff meet subsection (B) of the definition by asserting that she "had a

record of mental disability and impairment since attempting suicide as a teenager." Pl.'s Stmt. ¶

4. Despite Plaintiff's assertion – and her unsubstantiated claim that she was diagnosed with

schizophrenia following her teenage suicide attempt, *see* Pl.'s Opp'n at 10 – as discussed above,

the factual record contains no evidence that Plaintiff was diagnosed with, received any treatment

for, or was under a doctor's care for any mental disability between her hospitalization for that

attempt and the fall of 2002. *See* Def.'s Ex. C (5/6/03 Psych. Eval.) at 1; Def.'s Ex. H (11/21/02

Letter from R. Maman); Pl.'s Ex. 13 (4/7/03 Stewart Diagnosis). Plaintiff need not proffer a

medical diagnosis to establish that she was disabled, *see Scarborough*, 190 F. Supp. 2d at 20;

however, Plaintiff's own evidence establishes that she worked at St. Elizabeth's as a

housekeeping aide without incident from 1984 through her transfer to JHP in January 2002. *See*

Pl.'s Ex. 2 (8/22/03 Stewart EEOC Aff.); Pl.'s Ex. 15 (1/5/04 Letter from S. Stoops).

　　Plaintiff also suggests that she had a record of a mental disability because the "undisputed

facts adduced by [Plaintiff] and defendant establish that defendant and its agents knew of her

disability [because Plaintiff] was initially hired *because of* her disability under the Patient Act,

and each of her supervisors including Wrenn Lucas [sic] knew that she had been hired under the

Act." Pl.'s Opp'n at 10, 12-13. Plaintiff's assertion is simply not supported by the factual

evidence. At her deposition, Ms. Wren-Lucas testified that she was aware that Plaintiff had initially been a patient hire and that she believed patient hires "stayed at the hospital before they became a regular employee." Pl.'s Ex. 3 (10/26/06 Wren-Lucas Dep. Tr.) at 13:5-14:16. However, Ms. Wren-Lucas' testimony gives no indication that she knew *why* Plaintiff had stayed at St. Elizabeth's. To the contrary, Ms. Wren-Lucas recalled in her deposition that patient hires might have stayed at the Hospital in connection with a substance-abuse program. *Id.* Nor would Ms. Wren-Lucas, Assistant Chief of Housekeeping, have had access to records from Plaintiff's stay at St. Elizabeth's in 1977 or 1978 even if such records were included in Plaintiff's personnel file. *See* Def.'s Reply at 6 ("under District law, disclosure of medical or other health information contained in an employees [sic] personnel file is prohibited" (citing D.C. Code § 1-631.05)). Again, there is also no evidence in the record that Plaintiff was under any sort of treatment as of January 2002, from which Ms. Wren-Lucas might have concluded that Plaintiff suffered from a mental disability. Simply put, Ms. Wren-Lucas' awareness that Plaintiff had been a patient hire in 1979 is not sufficient to establish that Ms. Wren-Lucas was aware of Plaintiff's alleged mental disability in January 2002 (by which point Plaintiff had been a permanent hire for more than 17 years).

Finally, Plaintiff cannot meet subsection (A) of the disability definition, which requires her to demonstrate that, as of January 2002, she suffered from a mental impairment that substantially limited one or more of her major life activities. Although Plaintiff's Opposition broadly asserts that she is disabled, Plaintiff fails to identify the major life activity as to which she claims to have been substantially limited prior to January 2002, perhaps because the record does not support such a claim. The factual record in this case does not contain any suggestion

that Plaintiff was substantially limited in the major life activities of caring for herself, performing

manual tasks, walking, seeing, hearing, speaking, breathing or learning.  *See* 29 C.F.R. §

1630.2(i) (EEOC regulation defining "Major Life Activities").  Nor can Plaintiff demonstrate

that she was substantially limited in the major life activity of working as of January 2002.

Plaintiff testified that she "went to [Ms. Wren-Lucas] before all this started, before she said she

would go move me.  I told her put me anywhere except for John Howard."  Pl.'s Ex. 1 (10/30/06

Stewart Dep. Tr.) at 60:15-21.  Plaintiff's request to be assigned to work elsewhere undercuts any

suggestion that she may have been substantially limited in the major life activity of working

because "to be substantially limited in the major life activity of working . . . one must be

precluded from more than one type of job, a specialized job, or a particular job of choice."

*Sutton*, 527 U.S. at 492, 119 S. Ct. 2139.  Plaintiff therefore cannot establish that, as of January

2002, she suffered from a mental impairment that substantially limited one or more of her major

life activities.

       2.     *Plaintiff Fails to Show That Defendant Had Notice of Her Disability in January 2002*

      Even if Plaintiff could establish that she was disabled under the Rehabilitation Act when

she requested not to be reassigned to JHP in January 2002, she would still be unable to establish

a prima facie case of failure to accommodate because there is no evidence in the record that Ms.

Wren-Lucas had notice of Plaintiff's alleged disability at that point in time.  While notice under

the ADA, and thus the Rehabilitation Act, "need not be precise . . . it must put the employer

sufficiently on notice of the existence and nature of the disability."  *Evans v. Davis Mem.*

*Goodwill Hosp.*, 133 F. Supp. 2d 24, 28 (D.D.C. 2000) (citing *Taylor v. Phoenixville School*

*Dist.*, 184 F.3d 296, 313 (3rd Cir. 1999)); *see also Crandall v. Paralyzed Veterans of America*, 146 F.3d 894, 897 (D.C. Cir. 1998) (the Rehabilitation Act only applies when a plaintiff's employer has "an awareness of the disability itself"); *Weigert v. Georgetown Univ.*, 120 F. Supp. 2d 1, 7 (plaintiff "has the burden of establishing with medical evidence the existence of the alleged disability, and presenting the documentation during the term of employment, not following employment") (citing *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 656 (D.D.C. 1997)).

As discussed above, Plaintiff cannot rely on Ms. Wren-Lucas' awareness that Plaintiff had initially been a patient hire in 1979 in claiming that Ms. Wren-Lucas had notice of Plaintiff's mental disability in January 2002 when there is no evidence that Plaintiff was under treatment at that point in time. Nor does the record evidence of Plaintiff's conversation with Ms. Wren-Lucas prior to her transfer to JHP establish that Plaintiff told Ms. Wren-Lucas that she had a mental disability, let alone that she believed she should not be transferred to JHP due to that alleged mental disability. *See* Pl.'s Ex. 1 (10/30/06 Stewart Dep. Tr.) at 60:15:62:17, 70:6-71:5; Pl.'s Ex. 6 (5/5/04 FER Notes re: Tele/Conv. with W. Trimmier). Plaintiff thus fails to demonstrate that Ms. Wren-Lucas had notice of any alleged disability on Plaintiff's part as of January 2002, or that such disability was the reason that Plaintiff did not wish to be transferred to JHP. Accordingly, Plaintiff has not made out a prima facie case of failure to accommodate with respect to her alleged request to Ms. Wren-Lucas in January 2002.

> C.    *Plaintiff Cannot Establish a Prima Facie Case As to Her Alleged Complaints to Mr. Trimmier, Ms. Prioleau, and Mr. Burnett Early in 2002*

Plaintiff's Amended Complaint identifies only two alleged requests for accommodation –

her January 2002 conversation with Ms. Wren-Lucas and her conversation with Mr. Burnett in

the fall of 2002. Nevertheless, in her Statement of Material Facts, Plaintiff now asserts that she

also complained about her assignment to JHP to Mr. Trimmier and Ms. Prioleau, and that she

complained to Mr. Burnett about her assignment early in 2002. *See* Pl.'s Stmt. ¶ 31-33. As an

initial matter, for the reasons set forth above, insofar as Plaintiff claims that she spoke to these

individuals regarding her assignment to JHP early in 2002, Plaintiff cannot establish that she was

disabled under the Rehabilitation Act at that point in time. Moreover, as discussed above, none

of the record evidence of these conversations suggests that Plaintiff told Mr. Trimmier, Ms.

Prioleau, or Mr. Burnett (at least in early 2002) that she had a mental disability or that she did not

believe she should be transferred to JHP due to such mental disability. *See* Pl.'s Ex. 1 (10/30/06

Stewart Dep. Tr.) at 66:2-7 (stating that Plaintiff did not complain to Ms. Prioleau), 71:6-22

(indicating that Plaintiff discussed employees spreading rumors with Mr. Burnett prior to

September 2002); Pl.'s Ex. 6 (5/5/04  FER Notes re: Tele/Conv. with W. Trimmier).[11]  As such,

Plaintiff cannot establish that Mr. Trimmier, Ms. Prioleau, or Mr. Burnett had notice of her

alleged mental disability early in 2002.

Plaintiff attempts to avoid the conclusion that none of Defendant's employees had notice

of Plaintiff's alleged disability early in 2002 by asserting that, although Defendant "had a right to

require medical documentation" of Plaintiff, "defendant did not make any such request or engage

---

[11] The Court notes that during her deposition, Plaintiff indicated that she discussed her "problem" with Mr. Trimmier, however, it does not appear that Plaintiff actually told Mr. Trimmier that she suffered from a mental disability. Instead, Plaintiff testified only that she had lost a lot of weight and that Mr. Trimmier told Plaintiff that she wasn't herself at that time. *See* Pl.'s Ex. 1 (10/30/06 Stewart Dep. Tr.) at 55:12-56-5. Moreover, it is not clear from Plaintiff's testimony whether this conversation occurred before or after Plaintiff's October 2002 suicide attempt. *Id.*

31

in an interactive process." Pl.'s Opp'n at 13. This two-pronged argument altogether lacks merit.

First, Ms. Wren-Lucas, Mr. Trimmier, Ms. Prioleau, and Mr. Burnett would have had no reason

to request medical documentation from Plaintiff because, as established above, they were

unaware of Plaintiff's alleged mental disability. Second, although Plaintiff refers to Defendant's

obligation to "engage with the employee in an 'interactive process' to determine the appropriate

accommodation under the circumstance," Pl.'s Opp'n at 13 (quoting *Gile v. United Airlines, Inc.*,

95 F.3d 492 (7th Cir. 1996); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th

Cir. 1996)), "this obligation is generally only triggered by an affirmative request" for an

accommodation. *Evans*, 133 F. Supp. 2d at 28 (citing *Flemmings*, 198 F.3d 857). Here, because

Plaintiff was not disabled under the Rehabilitation Act, and did not provide Ms. Wren-Lucas, Mr.

Trimmier, Ms. Prioleau, or Mr. Burnett with notice of her alleged disability, it follows that her

request to be reassigned from JHP could not have constituted a request for a reasonable

accommodation for her disability. The Court therefore concludes that Plaintiff cannot establish a

prima facie case of failure to accommodate with respect to her alleged complaints to Mr.

Trimmier, Ms. Prioleau, and Mr. Burnett early in 2002.

> D.    *A Genuine Question of Material Fact Exists With Respect to Plaintiff's Alleged*
> *Conversation With Mr. Burnett in the Fall of 2002*

In addition, however, Plaintiff alleges that she requested a reassignment out of JHP from

Mr. Burnett in the fall of 2002, and that Defendant made no effort to accommodate her request.

*See id.* ¶ 9. Furthermore, in her August 22, 2003 EEOC Affidavit, Plaintiff asserts that shortly

before she went out on medical leave (i.e., in October 2002), she "had a meeting with Jasper

Bernnett [sic], Administrator, about my request to be removed from the Ward because of my

32

disability. Mr. Bernnett [sic] told me to talk to CEO, Joy Harlin. Mr. Bernnett [sic] was

supposed to get back to me within ten (10) days; however, he never responded to my request."

Pl.'s Ex. 2 (8/22/03 Stewart EEOC Aff.); *see also* Pl.'s Stmt. ¶ 36.  The Court therefore

considers whether Plaintiff can establish a prima facie case of failure to accommodate with

respect to her conversation with Mr. Burnett in the fall of 2002, and concludes that genuine

questions of material fact exist as to this conversation that preclude summary judgment for

Defendant.

### *1.    A Factual Issue Exists As To Whether Plaintiff Was Disabled Under the Rehabilitation Act in the Fall of 2002*

Again, to make out a prima facie case of failure to accommodate, Plaintiff must first

establish that she was disabled under the Rehabilitation Act as of the fall of 2002.  Plaintiff

cannot do so pursuant to subsection (C) of the disability definition because she does not suggest

that she was mistakenly "regarded as having" a disability in the fall of 2002.  *Sutton*, 527 U.S. at

489, 119 S. Ct. 2139.  Nor does Plaintiff demonstrate – pursuant to subsection (B) of the

definition – that she had "a record of" a disability prior to her October 2002 suicide attempt.

Significantly, the first medical documentation of Plaintiff's mental disability found in the record

is the November 3, 2003, Psychiatric Assessment that Plaintiff received at George Washington

Hospital.  Def.'s Stmt. ¶¶ 15-16; Pl.'s Stmt. ¶¶ 15-16; Def.'s Ex. G (11/3/02 Psych. Assm't).

Plaintiff may, however, be able to meet subsection (A) because she proffers some

evidence that in the fall of 2002 she suffered from a mental impairment that substantially limited

one or more of her major life activities.  42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(g)(A).

Plaintiff again undercuts any suggestion that she was substantially limited in the major life

activity of working because her requested accommodation in the fall of 2002 – a transfer out of JHP – indicates that she was still able to work at that point in time.  Nevertheless, during her deposition, Plaintiff testified that as of October of 2002, she could not eat, sleep or function, and was "hearing people".  Def.'s Ex. S (10/30/06 Stewart Dep. Tr.) at 16:20-17:5.  Plaintiff also testified, apparently about her condition following her October 2002 suicide attempt, that she "didn't know too much about anything anymore.  I didn't know who was paying the rent.  I didn't know who was taking care of my kids.  I didn't know about the job anymore. . . ."  Pl.'s Ex. 1 (10/30/06 Stewart Dep. Tr.) at 57:4-7; Pl.'s Opp'n at 5.

Plaintiff need not proffer medical evidence of her disability, rather her personal testimony may be sufficient to raise a genuine issue regarding the extent to which her mental impairment limited one or more of her major life activities.  *See Haynes*, 392 F.3d at 482 ("Whatever the comparative credibility of medical versus personal testimony, a plaintiff's personal testimony cannot be inadequate to raise a genuine issue regarding [her] 'own experience'") (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567, 119 S. Ct. 2162, 144 L. Ed. 2d. 518 (1999)); *see also Toyota*, 534 U.S. at 198, 122 S. Ct. 681 ("the ADA requires those claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation . . . in terms of their own experience . . . is substantial.") (internal quotation and citation omitted).  Defendant has not proffered any evidence to demonstrate that Plaintiff was not substantially limited in the major life activity of caring for herself in the fall of 2002 and, in any event, the Court concludes that Plaintiff has proffered sufficient evidence to raise a genuine question as to this material fact.

2.    *A Factual Issue Exists As To Whether Mr. Burnett Had Notice of*

*Plaintiff's Disability in the Fall of 2002*

The Court therefore turns to considering whether Plaintiff has proffered evidence that Defendant had notice of her disability in the fall of 2002. As an initial matter, the Court notes that Plaintiff does not provide factual support for her assertions that she began "to display psychotic symptoms that affected her ability to perform her job in the months after her transfer, and the recurrence of her mental illness did not go unnoticed by her peers and supervisors well before she went out on leave." Pl.'s Opp'n at 13. Significantly, even if Plaintiff exhibited behavior between January and October 2002 that might be viewed as questionable by her co-workers and supervisors, the record is devoid of evidence that those co-workers and supervisors attributed Plaintiff's behavior to a mental disability. Instead, the record demonstrates that a completely unrelated explanation existed for each of Plaintiff's alleged "psychotic symptoms." For instance, Plaintiff asserts that she became "increasingly fearful and panicky while working at JHP and had to be escorted by other staff members" on the wards. Pl.'s Stmt. ¶ 34; Pl.'s Ex. 2 (8/22/03 Stewart EEOC Aff.); Pl.'s Ex. 9 (6/12/03 EEOC Charge Questionnaire). However, Plaintiff herself connects her increased anxiety and need to be escorted on the wards to the April 2002 incident in which a JHP patient exposed himself to Plaintiff. *See* Pl.'s Stmt. ¶ 34; Pl.'s Ex. 8 (4/19/02 Unusual Incident Report). Similarly, while Plaintiff points to Ms. Prioleau's account of finding Plaintiff "crying, shaking, talking to herself" as evidence of her erratic behavior, *see* Pl.'s Stmt. ¶ 35 (citing Pl.'s Ex. 7 (9/15/03 Prioleau Mem.)), Ms. Prioleau indicates that Plaintiff was upset in that instance because of rumors being spread about her by other employees, Pl.'s Ex. 7 (9/15/03 Prioleau Mem.).

Thus, although Plaintiff asserts that during the fall of 2002 she experienced "unexplained

paranoid and delusional behavior," Pl.'s Stmt. ¶ 35, the record contains no basis for concluding

that Plaintiff's co-workers or supervisors viewed it as such.  Moreover, it is clear that as of the

fall of 2002, Plaintiff certainly had not provided her co-workers and supervisors – who were lay

persons within the housekeeping department rather than medical professionals – with sufficient

information for them to know or recognize that her behavior might be related to a mental

disability.  *See Crandall*, 146 F.3d at 897 ("the employer must have acted with an awareness of

the disability itself, and not merely an awareness of some deficiency in the employee's

performance that might be a product of an unknown disability"); *see also Bugg-Barber v.*

*Randstad US, L.P.*, 271 F. Supp. 2d 120, 129 (D.D.C. 2003).  Nor can Plaintiff demonstrate that

Defendant had notice of her mental disability in the fall of 2002 by asserting that her

"deteriorating mental state was discussed" "at a supervisors meeting which included her then

supervisor Prioleau," Pl.'s Stmt. ¶ 36, because, as discussed above, this evidence appears to be

inadmissible hearsay.

     However, Plaintiff has proffered credible evidence, in the form of her August 22, 2003

EEOC Affidavit, that shortly before she went out on medical leave (i.e., in October 2002), she

"had a meeting with Jasper Bernnett [sic], Administrator, about my request to be removed from

the Ward because of my disability.  Mr. Bernnett [sic] told me to talk to CEO, Joy Harlin.  Mr.

Bernnett [sic] was supposed to get back to me within ten (10) days; however, he never responded

to my request."  Pl.'s Ex. 2 (8/22/03 Stewart EEOC Aff.); *see also* Pl.'s Stmt. ¶ 36.  As

Defendant denies that Plaintiff spoke with Mr. Burnett on September 9, 2002, Def.'s Resp. to

Pl.'s Stmt. ¶ 36, a clear factual issue exists as to whether or not Plaintiff provided Mr. Burnett

with notice of her mental disability and requested a reasonable accommodation in the fall of

2002.

### 3.   These Factual Issues Preclude Summary Judgment as to Plaintiff's Conversation With Mr. Burnett in the Fall of 2002

In order to prove a prima facie case of failure to accommodate, Plaintiff must also establish that with reasonable accommodation she could have performed the essential functions of her position and that Defendant refused to make such accommodations. *See Scarborough*, 190 F. Supp. 2d at 19.   The record simply does not contain evidence as to whether Plaintiff could, in fact, have continued to perform the essential functions of a housekeeping aide in the fall of 2002 had she been reassigned from JHP.   Although Plaintiff's doctor and therapist have opined in retrospect that Plaintiff's assignment to JHP triggered her decompensation in the fall of 2002, *see* Pl.'s Opp'n at 5-6 (citing Pl.'s Ex. 15 (1/5/04 Letter from S. Stoops) and Pl.'s Ex. 16 (12/17/03 Letter from M. Kinnaman)), it is unclear from the record what effect, if any, reassigning Plaintiff out of JHP would have had in the fall of 2002.   Nor does Plaintiff affirmatively allege that Mr. Burnett refused to accommodate Plaintiff's request for an accommodation in the Fall of 2002, rather her EEOC Affidavit states that Mr. Burnett never responded to her request.   Pl.'s Ex. 2 (8/22/03 Stewart EEOC Aff.).   Nevertheless, the Court concludes that summary judgment is inappropriate as to Plaintiff's claim that Defendant failed to accommodate the request for a reasonable accommodation she made to Mr. Burnett in the fall of 2002, in light of the substantial and genuine questions of material fact that exist as to whether Plaintiff was disabled in the fall of 2002 and whether Mr. Burnett had notice of that disability.

### E.   Plaintiff Cannot Establish a Prima Facie Case of Failure to Accommodate Following Her October 2002 Suicide Attempt

Finally, in addition to the primary allegations discussed above, Plaintiff's February 8,

2005 Amended Complaint also alleges in passing that "[t]o this day, defendant's have refused to provide a reasonable accommodation for [Plaintiff's] disability, and [Plaintiff] remains under the care of her physicians." *Id.* ¶ 11. Although it is not clear that Plaintiff intends to assert that Defendant failed to accommodate her disability following her October 2002 suicide attempt, the Court nevertheless notes that she cannot do so because she is unable to establish the requisite prima facie case. Specifically, Plaintiff has not proffered evidence demonstrating that she actually requested a reasonable accommodation after her October 2002 suicide attempt, or that such an accommodation existed. *See Flemmings*, 198 F.3d at 86-62 ("An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied.") (citations omitted).

Plaintiff's strongest assertion that she asked to return to work following her October 2002 suicide attempt is found in her August 22, 2003 EEOC Affidavit, in which she states "[s]ince going out on medical leave in October 2002, I have tried several times to be returned to work; however none of my requests have been granted. The Respondent refuse [sic] to place me in a suitable position that would accommodate my disability and work restrictions." Pl.'s Ex. 2 (8/22/03 Stewart EEOC Aff.). However, even if Plaintiff in fact requested to return to work prior to August 2003, her therapist's certification from November 2003 indicates that Plaintiff was not yet ready to return to work at that point in time. Pl.'s Ex. 14 (11/12/03 Letter from S. Stoops). Plaintiff therefore cannot make out a prima facie case that Defendant failed to accommodate her disability following her October 2002 suicide attempt because she has proffered no evidence that she requested a reasonable accommodation or that Defendants refused to grant her request. As a result, the Court declines to address Defendant's argument that it reasonably accommodated

38

Plaintiff's disability by granting her requests for with leave without pay.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that genuine questions of material fact

exist which preclude summary judgment with respect to Plaintiff's alleged request for an

accommodation in the fall of 2002.  However, Plaintiff cannot establish a prima facie case of

failure to accommodate with respect to her earlier alleged requests or her claim that she was

denied a reasonable accommodation following her October 2002 suicide attempt.  The Court

shall therefore grant-in-part and deny-in-part Defendant's Motion for Summary Judgment, and

shall limit Plaintiff's triable claim to her alleged request for an accommodation in the fall of

2002.

Date:   August 2, 2007

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge